SIGNAL OIL AND GAS COMPANY,
Petitioner,

v.

UNIVERSAL OIL PRODUCTS et
al., Respondents.

No. B–6629.

Supreme Court of Texas.

July 12, 1978.

Rehearing Denied Oct. 4, 1978.

Kronzer, Abraham & Watkins, W. James Kronzer, Royston, Rayzor, Vickery & Williams, D. J. Holcombe and Ted C. Litton, Houston, for petitioner.

Baker & Botts, Joseph D. Cheavens and Douglas S. Sandage, Fulbright & Jaworski, David J. Beck and Arnold Anderson Vickery, Hicks, Hirsch, Glover & Cochran, Les Cochran, Houston, for respondents.

JOHNSON, Justice.

Signal Oil & Gas Company (hereinafter referred to as Signal)[1] sued Universal Oil Products (UOP), Procon, Inc. (Procon), and Alcorn Combustion Company (Alcorn) for property damage and economic loss resulting from an explosion and fire at Signal's Houston refinery. Signal sued UOP, Procon, and Alcorn in strict liability and negligence for defects in the manufacture, design, and/or installation of an isomax reactor charge heater. Signal further sued UOP and Procon for breach of the implied warranty arising from the isomax unit's design, construction, and installation which failed to meet acceptable engineering standards. Alcorn was also sued for breach of the implied warranty arising from the manufacture and sale of the unit which was unfit or unsuitable for its intended use. Procon filed a cross claim against Alcorn for indemnity. Based on jury findings to special issues, the trial court denied Signal any relief as to all three defendants. The court of civil appeals affirmed. 545 S.W.2d 907. We affirm the judgments of the courts below as to the strict liability cause of action. We reverse the judgments of the courts below and remand the case for a new trial on the merits as to the implied warranty cause of action against Alcorn and Procon.[2]

On April 6, 1962, Signal entered into an Isomax Process License Agreement with UOP, which agreement was subsequently amended on March 24, 1966. In such agreement UOP, as owner of the patent rights to the isomax process, granted Signal a license to use the isomax process in Signal's plants. On June 22, 1966, Signal contracted with Procon, a subsidiary of UOP, wherein Procon agreed to obtain the necessary materials and equipment and to construct an isomax unit and hydrogen plant at the Signal plant in Houston. Prior to this contract, on March 24, 1966, Procon and UOP had entered into an engineering agreement

1. In the lower court proceedings two other parties joined Signal as plaintiffs and appellants: The Signal Companies, Inc., the parent company of Signal Oil & Gas Company, and Bank of America National Trust & Savings Association, which financed the isomax unit at the Signal plant in Houston and held an interest therein. In this court all the parties submitted an agreed motion requesting the dismissal without prejudice of The Signal Companies, Inc. and Bank of America National Trust & Savings Association. The motion was filed in this court on November 11, 1977, with the request that the court issue an order carrying out the agreement of the parties to clarify the alignment of parties in the instant suit. This motion is granted concurrent with rendition of this opinion such that Signal Oil & Gas Company remains the only petitioner presently before this court.

2. The judgment of the trial court as to UOP is not before this court on appeal and is therefore final. The judgment is likewise final as to the liability of all parties under the negligence cause of action because no error in such judgment is alleged in this court.

whereby UOP agreed to provide Procon with the necessary engineering design specifications for the isomax unit construction at the Signal plant. UOP provided the specifications for the isomax reactor charge heater, a component part of the plant, to Procon on April 18, 1966. Thereafter, on July 21, 1966, Procon contracted by purchase order with Alcorn for the purchase of the reactor charge heater; Alcorn accepted such order on October 24, 1966. Thereafter, Alcorn furnished the heater, and Procon erected and installed the unit at the Houston plant site. The isomax process unit began operation in February 1968. Less than three months later, on April 26, 1968, the unit ruptured causing a fire which resulted in the damages for which this suit was brought.

The design of the reactor charge heater consisted of gas burners surrounded by steel tubes through which oil flowed. The tubes were braced at their midpoints with guides. The specifications called for the tube guides to be anchored by 25–12 bolts, a stainless steel bolt. About the first of March, 1968, it was discovered that some of the middle tube guides had fallen to the floor of the heater and that the tubes had begun to bow inward. At that time, one of the bolts was retrieved; it was determined that B-7 bolts had been used, rather than the 25–12 bolts. These B-7 bolts were not designed to withstand the high temperatures generated by the heater.

Signal alleged two basic theories for the cause of the tube rupture and ensuing fire. The first theory was that the B-7 bolts failed to hold the tube guides in place; therefore, without these braces the tubes carrying oil bowed inward toward the gas burners, resulting in a rupture and a fire. The second theory was that scaling or coke accumulation had collected inside the tubes, causing the rupture. Signal developed these theories in presenting its causes of action based upon negligence, strict liability, and breach of implied warranty. Special issues developing all three causes of action as to each of the three defendants were presented to the jury.[3] Signal has conceded in its brief before the court of civil appeals that the judgment as to UOP should be affirmed and has not alleged any error in this court concerning UOP; therefore, the liability of UOP will not be discussed herein.

## NEGLIGENCE CAUSE OF ACTION

In Signal's negligence cause of action against Procon and Alcorn the jury found that Alcorn was negligent in not supplying 25–12 bolts and that Procon was negligent in using the B-7 bolts in erecting the heater. Both actions were found to be the proximate cause of the tube rupture. However, the jury additionally found that Signal was contributorily negligent in not shutting down the heater before the fire since it was warned of the hazard and failed to heed that warning. Accordingly, the trial court denied Signal recovery under its negligence cause of action.[4] In the court of civil appeals and in this court, judgment on the negligence cause of action is not challenged. Accordingly, the trial court determination and judgment is final as to the negligence cause of action.

## STRICT LIABILITY CAUSE OF ACTION

Signal asserted a cause of action in strict liability against Alcorn and Procon, alleging that they were the furnishers, sellers, or

---

3. The cause was submitted to the jury upon fifty-six special issues. Special issues 1–11 developed findings as to Alcorn's negligence, breach of implied warranty, and liability under strict liability. Special issues 12–18 developed similar findings as to Procon. Special issues 19–35 developed findings as to UOP's negligence and liability in strict liability. Special issues 36–55 developed findings as to Signal's negligence, assumption of the risk, and misuse of the product. Special issue 56 presented the question of damages.

4. Contributory negligence barred recovery in the instant cause of action because it arose prior to September 1, 1973, the effective date of Article 2212a, Texas Revised Civil Statutes Annotated. In Article 2212a Texas adopted the statutory system of modified comparative negligence.

manufacturers of a defective product which was unreasonably dangerous.[5] The jury found the reactor charge heater as shipped by Alcorn and as erected by Procon was defective. The jury further found that Signal incurred property damage in the amount of $378,000. But the jury failed to find that the defective condition constituted a producing cause of the tube rupture. Accordingly, the trial court held that Signal could not recover in strict liability against Alcorn or Procon; the court of civil appeals affirmed.

Signal contends that this case is first and foremost a strict liability cause of action for property damages resulting from a defective product. Signal argues that the jury findings taken as a whole, rather than in sequence, support recovery in strict liability. Signal points out that the jury found *proximate causation* in the special issue series developing the negligence cause of action and urges that these proximate causation findings are operative in the strict liability issue series, even though the jury failed to find *producing cause* under the strict liability theory. The thrust of Signal's argument is that proximate causation by definition includes the lesser causative element of producing cause which is the necessary causative element in strict liability; therefore, the findings in the negligence series should support the causation findings in strict liability. Continuing this reasoning, Signal urges that the special issue findings taken as a whole support a cause of action for strict liability to which contributory negligence is not a defense.

*Henderson v. Ford Motor Company*, 519 S.W.2d 87 (Tex.1974). Furthermore, Signal points out that those defenses which could bar or mitigate recovery in strict liability—assumption of the risk and misuse of the product—were not supported by the jury findings in the instant case.[6] Accordingly, Signal urges that it is entitled to recover $378,000 for property damages in its strict liability cause of action.

The court of civil appeals agreed with Signal that the special issues may be read as a whole, rather than taken in the sequence as presented to the jury, relying upon *Pizza Inn, Inc. v. Tiffany*, 454 S.W.2d 420 (Tex.Civ.App.—Waco 1970, no writ). However, the court of civil appeals determined that the alignment of issues was governed essentially by whether the issues were predicated upon the same set of facts. In the instant case the court held that the causation findings in the strict liability issue series and in the negligence issue series were not essentially predicated upon the same facts. The intermediate court noted that Signal had asserted two causative theories for the explosion; although the negligence issues were limited to one of these theories (the use of the wrong bolts), the strict liability issues were not so limited and could have been interpreted by the jury as an inquiry on the other causation theory (coke accumulation in the tubes). Accordingly, the court of civil appeals held that the findings were not interchangeable and that the strict liability issue series did not support Signal's recovery of property damages.

5. The charge to the jury stated: "For the purposes of this case, a product may be considered defective or defectively designed if, at the time of the erection of the reactor charge heater in Houston, it is in a condition not expected by Signal Oil & Gas Company and which would be unreasonably dangerous to the ordinary petroleum refiner who purchased such equipment situated as was Signal Oil & Gas Company.

"To be 'unreasonably dangerous' a product must be dangerous to an extent beyond that which would be expected by the ordinary petroleum refiner situated as was Signal Oil & Gas Company with the ordinary knowledge common to the community of petroleum refiners as to the characteristics of such heater."

6. In special issue 41 the jury found that Signal did not voluntarily assume the risk when instructed that in order for Signal to have assumed the risk "it must have actually known and fully appreciated the nature and extent of the danger involved in operating the reactor charge heater without the middle tube guides and it must have voluntarily and of its own free will encountered the danger of such condition causing its damages, if any." In special issue 42 the jury found that Signal's operation of the heater without the middle tube guides was a misuse of the heater; but in special issue 43 the jury failed to find that such misuse was a producing cause of the fire.

■ This court affirms the court of civil appeals ruling on this issue. We agree with Signal in its contention that this suit may be considered as a strict liability cause of action. Under Section 402A of the Restatement (Second) of Torts a buyer is entitled to recover for property damages sustained as a result of an unreasonably dangerous product:

"One who sells any product in a defective condition unreasonably dangerous to the user or consumer or *to his property* is subject to liability for physical harm thereby caused to the ultimate user or consumer, or *to his property* . . . ." [Emphasis added.]

However, in *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977), this court restricted the scope of strict liability causes of action by precluding recovery for economic loss and holding that such economic loss was recoverable only under the Texas Business and Commerce Code. In *Mid Continent Aircraft Corporation v. Curry County Spraying Service, Inc., and Cravens, Dargan and Company*, 572 S.W.2d 308 (Tex.1978), decided this day, this court has further held that where only the product itself is damaged, such damage constitutes economic loss recoverable only as damages for breach of an implied warranty under the Code. In the instant case Signal has alleged property damages in the form of damages to the product itself, *as well as to other surrounding property*. In Paragraph XII of Signal's second amended original petition, property damages are pleaded as follows:

"As a proximate result of the explosion and fire aforesaid, there was extensive damage not only to the reactor charge heater *but also to other equipment in the unit and other property in the area.* A large quantity of product contained in the unit was damaged and lost. The catalyst contained in the unit was damaged. Plaintiffs sustained property damages and related extraordinary expenses in an amount in excess of NINE HUNDRED AND FIFTY–NINE THOUSAND, FOUR HUNDRED AND NINETY–THREE and 22/100 DOLLARS ($959,493.22)." [Emphasis added.][7]

Where such collateral property damage exists in addition to damage to the product itself, recovery for such damages are recoverable under Section 402A of the Restatement (Second) of Torts as damage to property or under the Texas Business and Commerce Code, Section 2.715, as consequential damages for a breach of an implied warranty. To the extent that the product itself has become part of the accident risk or the tort by causing collateral property damage, it is properly considered as part of the property damages, rather than as economic loss.[8]

■ Therefore, Signal has properly alleged a cause of action in strict liability based upon its allegations of property dam-

---

7. As a further indication that Signal asserted damages for property other than damage to the product itself, consider: special issue 56 which asked the jury to determine Signal's financial injury, if any. The jury was instructed to only consider the following elements of damage: "(a) Repair of the property damage proximately caused by tube rupture and fire. (b) Actual loss of profits." The jury found $378,000 in property damages and zero damages for loss of profits. A comparison of this jury finding on property damages with the purchase orders between Procon and Alcorn reflect that these damages include more than damage to the isomax heater only. The cost of the reactor charge heater was originally $196,950. Certain adjustments requested by Procon concerning relocation of terminals in the heater resulted in an additional cost of $2,625. Accordingly, the approximate cost of the heater was $199,575, a substantially smaller sum than the property damages found by the jury. [Purchase Order Change dated November 17, 1966.]

8. Dean Keeton, in an *Annual Survey of Texas Law on Torts,* Southwestern Law Journal, Volume 32 (1978), at 5, states in discussing *Nobility* and *Mid Continent:*

"A distinction should be made between the type of 'dangerous condition' that causes *damage only to the product itself* and the type that is dangerous to other property or persons. A hazardous product that has harmed something or someone can be labeled as part of the accident problem; tort law seeks to protect against this type of harm through allocation of risk. In contrast, a damaging event that harms *only* the product should be treated as irrelevant to policy considerations directing liability placement in tort." [Emphasis added.]

ages. However, Signal failed to acquire favorable jury findings in order to support recovery under this theory of strict liability. This court disagrees with Signal's contention that the proximate causation issue in the negligence series may be interchanged or substituted for the failure to find producing cause in the strict liability issue series. Such an interchanging of the issues would result in the court's creating a conflict of issues, rather than reconciling conflicting findings where possible. In *Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985 (1949), the supreme court established the test to determine whether jury findings are conflicting. In that opinion the court stated that where the use of one answer would support a favorable verdict for the plaintiff and the use of the other finding would require judgment in favor of the defendant, then the answers are fatally in conflict. Just such a result would be accomplished should the court adopt the substitution of issues advocated by Signal. By use of the producing cause findings in the strict liability issue series, Signal would not be entitled to a favorable judgment under strict liability. By use of the proximate causation findings in the negligence series in addition to the strict liability findings, Signal asserts that it would be entitled to recovery in strict liability. Such a result would create a conflict in jury findings. However, under *Little Rock,* a court is under the duty to reconcile conflicting jury findings if at all possible. This the court of civil appeals has done by holding that the causation issues in the negligence series and in the strict liability series are controlled by different sets of facts. We agree with that reconciliation of the issues. Accordingly, Signal has failed to obtain the favorable jury findings necessary to support recovery in strict liability; therefore this court affirms the judgment of the court of civil appeals as to the strict liability cause of action.

### IMPLIED WARRANTY CAUSE OF ACTION

The third theory of recovery submitted by Signal against Procon and Alcorn was breach of an implied warranty of fitness or suitability. The jury found that both Alcorn and Procon failed to provide or to erect a heater reasonably suited for its intended use or purpose. The jury further found that such unsuitability was a proximate cause of the tube rupture. In addition, the jury found that Signal incurred property damages in the amount of $378,-000, but did not find that Signal suffered any economic loss in the form of loss of profits.[9] However, the trial court and the court of civil appeals held that the jury findings that Signal was negligent in failing to heed the warning and shut down the heater prior to the fire barred recovery under the implied warranty theory of recovery.

Signal challenges the judgments of the lower courts on two grounds: (1) that the case does not involve an implied warranty under the Texas Business and Commerce Code, but a warranty implied as a matter of law as enunciated in *Jacob E. Decker & Sons, Inc. v. Capps*, 139 Tex. 609, 164 S.W.2d 828 (1942); and (2) that the buyer's contributory negligence is not defensive of an implied warranty cause of action whether such cause of action is a warranty implied at law or a warranty action under the Texas Business and Commerce Code.

■ Signal's contention that there are separate and distinct causes of action for a warranty implied at law and an implied warranty under the Texas Business and Commerce Code has been effectively answered in this court's recent opinion in *Nobility Homes of Texas, Inc. v. Shivers, supra.* In *Nobility* the court specifically stated that since Texas has adopted Section 402A of the Restatement (Second) of Torts and the Uniform Commercial Code, "[t]he protection of Texas consumers no longer requires the utilization of an 'implied warranty as a matter of public policy.'" 557 S.W.2d 77 at 78. Accordingly, defective product remedies are now to be considered

---

9. *See* footnote 7, *supra,* for damages issue submitted to the jury.

as adequately provided for under the Restatement (Second) of Torts and the Texas Business and Commerce Code without resort to an implied warranty as a matter of public policy. In the instant case the warranty cause of action is governed by the implied warranty provisions of the Texas Business and Commerce Code.[10]

This court must now consider whether the buyer's negligence is a defense to an implied warranty cause of action under the Texas Business and Commerce Code. This is a question of first impression in Texas and one of considerable dispute in other jurisdictions. Generally there are three overlapping theories in dealing with this issue concerning the effect of the buyer's conduct upon recovery for breach of implied warranty: (1) only the buyer's assumption of the risk serves as a defense to actions for breach of implied warranty; (2) both the buyer's contributory negligence and assumption of the risk are defenses and bar recovery; and (3) neither assumption of the risk nor contributory negligence as such are defenses, rather, consideration goes to proximate causation and intervening acts.[11] The disparity in views on this issue is due in part to what is commonly referred to as a problem of semantics arising from the historical development of implied warranty with its roots in both contracts and torts.

The court of civil appeals determined that the buyer's negligence would operate to bar all recovery for a breach of an implied warranty under the Texas Business and Commerce Code. In so doing, the intermediate court applied the traditional tort defense of contributory negligence wherein a plaintiff is barred from recovery of all damages if he has contributed to his own injury in any degree.[12] Therefore, the court of civil appeals held that the *tort defense* of contributory negligence was operative in a *contract cause of action* based upon implied warranty. However, subsequent to the intermediate court decision herein, *Nobility Homes of Texas, Inc. v. Shivers, supra,* was rendered in which this court stressed that the tort theories behind strict liability and the contract theories behind implied warranty must be kept distinct. Thus, the approach this court takes in resolving the instant case must follow the precedent set in *Nobility* wherein the court expressed its preference to view implied warranty causes of action under the Texas Business and Commerce Code as actions in contract, not tort.

■ The draftsmen of the Code obviously felt that consideration should be given to

10. The Code specifically provides two implied warranties—the warranty of merchantability, Section 2.314, and the warranty of fitness, Section 2.315. Other implied warranties may arise from course of dealing or usage of trade, Section 2.314(c). Remedies for breach of warranty are furnished in Sections 2.714 and 2.715. Section 2.714 provides in part:
"(b) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
"(c) In a proper case any incidental and consequential damages under the next section may also be recovered."
Section 2.715 provides:
"(a) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with ef-

fecting cover and any other reasonable expense incident to the delay or other breach.
"(b) Consequential damages resulting from the seller's breach include (1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (2) injury to person or property proximately resulting from any breach of warranty."

11. For further discussion and analysis of the cases which follow the various theories, *see* 1 Hursh & Bailey, American Law of Products Liability 2d §§ 3:81–3:85 (1974); 2 Frumer & Friedman, Products Liability § 16.01[3] (1978); Annot., 4 A.L.R.3d 501.

12. Contributory negligence no longer bars recovery in a negligence cause of action in Texas since Texas enacted Article 2212a, Texas Revised Civil Statutes Annotated, which became effective on September 1, 1973. Article 2212a adopts the statutory system of modified comparative negligence.

the buyer's fault or negligence when determining recovery of consequential damages for a breach of implied warranty. Section 2.714 of the Code establishes the measure of damages for a breach of warranty. Section (c) thereunder states, "[i]n a proper case any incidental and consequential damages" may also be recovered. Section 2.715 defines "consequential damages" as including "injury to person or property *proximately* resulting from any breach of warranty." [Emphasis added.] In Comment 5 to Section 2.715 the draftsmen of the Code provided the following guidelines on proximate causation:

> "[T]he question of 'proximate' cause turns on whether it was *reasonable* for the buyer to use the goods without such inspection as would have revealed the defects. If it was not *reasonable* for him to do so, or if he did in fact discover the defect prior to his use, the injury would not proximately result from the breach of warranty." [Emphasis added.]

Comment 5 clearly indicates that the buyer's conduct may affect his recovery of consequential damages under an implied warranty cause of action. In addition, Comment 5 clearly speaks in terms of a "reasonable use" standard in examining the buyer's conduct. Such a reasonable use standard is normally associated with theories of negligence. *Rourke v. Garza,* 530 S.W.2d 794 (Tex.1975). However, the Code does not state that such buyer's negligence or fault will totally bar recovery as does contributory negligence under traditional tort principles. Rather, the Code and comments thereunder indicate that the buyer's negligence or fault is central to the issue of proximate causation in awarding consequential damages. *Dallison v. Sears, Roebuck and Co.,* 313 F.2d 343 (10th Cir. 1962); *Rasmus v. A. O. Smith Corporation,* 158 F.Supp. 70 (D.Iowa 1958).

■■■ As this court recently noted in a products liability case predicated upon Section 402A of the Restatement, *General Motors Corp. v. Hopkins,* 548 S.W.2d 344 (Tex. 1977), damages resulting from a defective product or an unsuitable product may be the result of concurring proximate causes. The fact that the buyer's negligence is a proximate cause of the damages does not negate the fact that a part of the damages was still a result of the breach of warranty or unsuitability of the product. Under Section 2.715 of the Code the buyer may recover only those consequential damages proximately caused by the breach of warranty; he may not recover for those consequential damages proximately caused by the buyer's own negligence or fault. This concept of the buyer's negligence or fault has a legal effect distinct from that of traditional contributory negligence in that the buyer's negligence or fault does not automatically bar recovery, but only diminishes or mitigates the damages the buyer may recover. Of course, where the buyer's negligence is the sole cause of the consequential damages, such negligence or fault will operate as a complete bar to recovery as does traditional contributory negligence. *Dallison v. Sears, Roebuck and Co., supra; Natale v. Pepsi Cola Co.,* 7 A.D.2d 282, 182 N.Y.S.2d 404 (1959); *Fredendall v. Abraham & Straus,* 279 N.Y. 146, 18 N.E.2d 11 (1938). But the instant case by no means presents a fact situation wherein the buyer's negligence or fault was the sole cause of the consequential damages sustained. Rather, the jury found that the property damages were caused by several concurring proximate causes—the breaches of warranty by Alcorn and Procon, as well as the negligence of Signal.

This court must now determine how concurring proximate causes are to be resolved in awarding damages in an implied warranty cause of action. As previously noted, this court in *General Motors Corp. v. Hopkins, supra,* was faced with concurring proximate causes of damages in a strict liability cause of action. In *Hopkins* the court held that the trier of fact should determine the relative percentages by which the concurring proximate causes contributed to the damages. The court then held that the plaintiff's recovery should be reduced or mitigated to the extent (percent-

age) his actions were a concurring proximate cause of the damaging event.[13]

■■■■ Although controlled by tort principles, the reconciliation of concurring causation in *Hopkins* provides an effective and valid pattern for reconciling similar concurring causation in implied warranty causes of action. The seller should only be held liable for that portion of the consequential damages caused by the breach of implied warranty. Therefore, this court holds that in a cause of action for breach of an implied warranty the buyer *may not recover* consequential damages to the extent that the buyer's negligence or fault was a concurring proximate cause of such damages. To the extent the product was unsuitable and proximately caused the damages, the buyer may recover consequential damages for breach of warranty. Under the present holding where both the unsuitable product and the buyer's negligence are found to be proximate causes of the damage, an additional determination must be made by the trier of fact: that being the respective percentages (totaling 100 percent) by which the concurring causes contributed to the consequential damages. As in *Hopkins,* this allocation of causation should not be confused with the statutory system of modified comparative negligence adopted in Texas. Tex.Rev.Civ.Stat.Ann. art. 2212a. Unlike comparative negligence, a buyer is entitled to recover that portion of the damages caused by the unsuitable product, even if the buyer's negligence or fault constitutes a greater cause of the damages than the seller's breach.

■■■■ In the instant case the jury found that the heater as supplied by Alcorn and erected by Procon was unsuitable and that such conditions of unsuitability were proximate causes of the tube rupture. In addition, the jury found that Signal was negligent in failing to heed the warning concerning the defects in the heater and that such failure was also a proximate cause of the tube rupture. Therefore, this case does not present circumstances where the actions of Signal constituted the sole cause of the damages so that its recovery should be totally barred. Instead, the court is currently presented with a case of multiple proximate causation which must be apportioned prior to any possible recovery of damages. Signal is entitled to recover that percentage of the property damages which may be found to have been caused by breaches of warranty by Alcorn and Procon. Signal may not recover that portion or percentage of the damages which may be found to have been caused by its own negligence or fault. As no findings were made on the respective percentages of causation between Signal, Alcorn, and Procon, this cause of action for breach of an implied warranty under the Texas Business and Commerce Code must be remanded for retrial on the merits and submission of issues in accordance with this opinion.

## PROCON'S STATUS AS A "SELLER"

■■■■ In the event that this court determined that Signal was entitled to recover for breach of implied warranty, Procon asserted a cross point which urges that it was not a "seller" under the Texas Business and Commerce Code. Procon maintains that in the instant case it supplied a service in erecting the isomax heater and did not act

---

**13.** "[I]f the product is found to have been unreasonably dangerous when the defendant placed it in the stream of commerce, and if that defect if found to have been a producing cause of the damaging event, and if the plaintiff has misused the product in the sense as defined by the trial court in its charge in the present case, and if that misuse is a proximate cause of the damaging event, the trier of fact must then determine the respective percentages (totalling 100%) by which these two concurring causes contributed to bring about the event. This comparison and division of causes is not to be confused with the statutory scheme of modified comparative negligence which bars all recovery to the plaintiff if his negligence is greater than the negligence of the parties against whom recovery is sought. Art. 2212a, Vernon's Ann. Civ.St. (P.P. 1976-1977). The defense in a products liability case, where both defect and misuse contribute to cause the damaging event, will limit the plaintiff's recovery to that portion of his damages equal to the percentage of the cause contributed by the product defect." 548 S.W.2d 344 at 352.

as a seller of such heater. It maintains that the Code is only applicable where a "sale" takes place.

In the instant case Signal contracted directly with Procon to purchase a completed product as assembled by Procon. The construction contract between Procon and Signal, dated June 22, 1966, specifically provided that Procon was contracted to "procure materials, equipment and labor for, and construct an Isomax Process Unit and Hydrogen Plant at SIGNAL'S refinery located at Houston, Texas." Furthermore, the contract did not provide for a "construction price" for Procon's services; rather, the contract provided that Signal would pay the *"purchase price"* to Procon which would include the cost of all materials and equipment. In paragraph 24 of the contract between Signal and Procon the parties negotiated precisely for the passage of title, providing:

> "Title to all facilities described in this Contract, including materials, equipment, tooling, et cetera, shall be in CONTRACTOR until the entire work shall have been completed and approved by SIGNAL, at which time title shall pass to SIGNAL or its nominee upon the delivery to it and acceptance by it of a Bill of Sale for such facilities."

Pursuant to this contract, on July 21, 1966, Procon contracted by purchase order with Alcorn to purchase a component part of the isomax unit. On this same date Procon executed a Certificate of Resale or Exemption Certificate for purposes of the Texas limited sales, excise, and use tax, which certificate was attached to the purchase order. In such certificate Procon stated that the tangible personal property (fired heaters) described in the purchase order with Alcorn was purchased for the purpose of "resale as tangible personal property." Alcorn supplied the parts of the isomax reactor charge heater with the specified degree of pre-shop assembly; Procon completed assembling the parts and erected the heater into the total isomax process unit. Under such facts, Procon was functioning basically as the assembler of component parts into a completed product, that being

the isomax process unit and hydrogen plant. Therefore, the issue becomes whether such an assembler of a completed product, as distinguished from a retailer of the manufacturer's product, is a seller under the Code.

The Texas Business and Commerce Code only provides a very broad definition of a "seller." Section 2.103 defines "seller" as "a person who sells or contracts to sell goods." In Section 2.106 a "sale" is defined as "the passing of title from the seller to the buyer for a price." Where the Code is not in conflict with the prior common law of warranty, such law supplements the basic provisions of the Code. Tex.Bus. & Com.Code Ann. § 1.103. In reviewing the case law concerning breaches of implied warranty, the courts have generally recognized that an assembler of a product who sells the completed product as his own is considered a seller against whom the buyer may bring an action for breach of implied warranty. *Holman v. Ford Motor Company*, 239 So.2d 40 (Fla.App.1970); *Continental Cas. Co. of Ill. v. Westinghouse Elec. Corp.*, 327 F.Supp. 720 (D.C.Mich.1970); *King v. Douglas Aircraft Company*, 159 So.2d 108 (Fla.App.1963); *Goldberg v. Kollsman Instrument Corp.*, 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81 (1963); 2 Hursh & Bailey, American Law of Products Liability 2d §§ 7:3 and 7:11. The reasoning behind holding that an assembler is a seller under the Code is based on sound policy. The suitability of the finished product depends as much upon actions of the assembler as upon actions of the manufacturer of the component parts. In order for the finished product to be merchantable or fit for its intended purposes, it must possess suitable component parts, as well as the proper arrangement, assembly, or combination of such parts. Consequently, the assembler constitutes an essential link in the chain of distribution. This reasoning is further supported by an opinion of the Kentucky court of appeals, *Frantz, Inc. v. Blue Grass Hams, Inc.*, 520 S.W.2d 313 (Ky.1974), which was based upon the Uniform Commercial Code. The facts in the instant case are similar to

those in *Frantz* where a mechanical contracting firm was held to be a seller. In such case Blue Grass hired Frantz, a mechanical contracting firm, to install a cooling system for which specifications were provided. Frantz in turn ordered the equipment and hired installers for the project. After installation, Frantz submitted a statement to Blue Grass for the total cost of the cooling system and other items it had supplied. Under such circumstances, the Kentucky court held that Frantz was a seller and merchant under the provisions of the Uniform Commercial Code.

We find unpersuasive Procon's reliance upon *Delta Refining Co. v. Procon, Inc.*, 552 S.W.2d 387 (Tenn.App.1976), which dealt with the status of Procon as a seller under the provisions of Section 402A of the Restatement (Second) of Torts. Procon urges that the reasoning of the Tennessee court in holding that Procon was not a seller is persuasive in the instant case as the Tennessee court was faced with an identical fact situation. In *Delta,* Procon, acting as the contracting construction subsidiary of UOP, contracted with Delta Refining Company to build refining facilities. A pump was ordered from Sunstrand pursuant to UOP's specifications, and Procon installed the pump into the plant unit. Under such conditions, the Tennessee court held Procon was not a "seller" because:

> "It was not in the business of selling such pumps. Procon merely contracted with Delta to purchase and install a pump which Sunstrand would build according to specifications furnished by Plaintiff." 552 S.W.2d 387 at 389.

The Tennessee court did not explain its reasoning, nor did it discuss the specific contract provisions operative in that case.

In the instant case the contract between Signal and Procon clearly shows that Procon acted as a seller. Procon functioned as the assembler of the component parts into a final completed product, the isomax unit and hydrogen plant. Procon maintained title in such product until it was sold to Signal by a bill of sale. Under the contract

provisions and circumstances of the instant case, we hold that Procon was a "seller" under the provisions of the Texas Business and Commerce Code.

Procon has additionally asserted a cross action against Alcorn, seeking to enforce an indemnity provision in their contract. In view of our disposition of this case in remanding the implied warranty cause of action to the trial court for retrial on the merits, this court does not pass upon Procon's asserted cross action against Alcorn. Such a determination by this court would be premature at this time. Upon remand, Procon's cross action against Alcorn may be asserted and considered by the trial court.

Therefore, this court holds that the judgment as to UOP has become final and against it Signal can take nothing. Further, the judgment in the negligence cause of action has become final in the courts below and Signal is not entitled to recover thereunder. This court affirms the judgments of the courts below as to the strict liability cause of action asserted against Alcorn and Procon. However, the judgment as to Procon and Alcorn for breach of an implied warranty is severed, and this severed cause is reversed and remanded for trial on its merits in accordance with this opinion. Rule 503, Texas Rules of Civil Procedure.

DANIEL, J., concurs in the result.

Concurring opinion by POPE, J.

POPE, Justice, concurring.

This case exemplifies the futility of distinguishing a strict liability case from a contract case by the new rule that was today announced in *Mid Continent Aircraft Corp. v. Curry County Spraying Service, Inc.*, 572 S.W.2d 308. In *Mid Continent* the court reached a result that conflicts with *Nobility Homes, Inc. v. Shivers,* 557 S.W.2d 77 (Tex.1977). We held in *Mid Continent* that the action was one in contract because the damages occurred to the product itself. In the present action we hold that the action is one in strict liability because the damages occurred to other prop-

erty. In my opinion, the cases cannot be factually reconciled.

I disagreed with the holding in *Mid Continent* that it was not a strict liability case, because the plaintiff obtained findings that the airplane crashed by reason of a defect that was unreasonably dangerous.[1] The majority opinion in *Mid Continent* announced a new rule, holding that in spite of those findings that match the requirements of section 402A, Restatement (Second) of Torts, the action was one in contract because the damages did not occur to the buyer's "other" property. In both *Mid Continent* and this *Signal Oil* case, the plaintiff asserted an action produced by a defect that was unreasonably dangerous. We reach opposite results, however, because the court says that in *Mid Continent* the damages were to the product itself but in this case the damages were to the buyer's "other" property.

The airplane in *Mid Continent* crashed because a crankshaft gear bolt had backed out of position. A safety device known as a clip or gear bolt lock plate had not been installed. The function of the clip was explained as:

> the "bolt when tightened properly will remain tight and prevent the bolt from backing out, to prevent the gear from getting loose and shearing the dowel pin, which will and did cause the stoppage of the engine."

The plaintiff was not suing to recover for the repairs or replacement of the faulty safety clip. That defect caused the airplane crash and the destruction of both wings, the propeller, the lower engine cowling, the nose cowling, the left aileron and the carburetor heat box. The defective clip caused a shearing of the dowel which accounted for only $147.13 damage to the engine. Yet, in the instance of the airplane crash, the court says that the damages were to the product itself, the airplane. The court says that the very substantial damages to the rest of the

plane were to the product itself and not "other" property. The plaintiff alleged and proved in *Mid Continent* that the plane was also carrying a supply of agricultural chemicals, all of which was destroyed in the crash. Why, then, does not that loss constitute damages to the plaintiff's "other" property as in *Signal Oil*? *Signal Oil* holds that once a defendant is caught on damages to any "other" property, then the suit may proceed even as to the product itself as a strict liability case.

The court's new test produces an interesting contrary result by the holding that Signal Oil's suit is one for strict liability. Instead of a defective clip, we have in *Signal Oil* the supplier's use of B-7 bolts when 25–12 bolts were called for by the specifications. The defective bolts resulted in a fire and damages to the isomax unit and hydrogen plant that Signal had purchased from Procon. In the case of *Signal Oil,* however, the court holds that there is an action in strict liability because the plaintiffs alleged damages to the product itself, "as well as other surrounding property." That surrounding property was the very isomax unit and hydrogen plant that Signal obtained from Procon. It is no different from the surrounding property in the form of both wings, fuselage, propeller, aileron, lower engine cowling, nose cowling, and carburetor heat box on the product sold by Mid Continent. In *Signal Oil,* the damage to the plant that it bought could be sought in a strict liability suit; in *Mid Continent* the damage to the airplane it sold cannot be sought in a strict liability suit. The holdings are inconsistent and portend problems that could be avoided by adhering to the criteria stated in section 402A.

This court's decision in this case is a correct one, however. Signal Oil alleged that the fire occurred because the product was defective and unreasonably dangerous to its property. That is what section 402A of the Restatement (Second) of Torts defines as an action in strict liability, and

---

1. 2. The absence of a crankshaft gear bolt lock plate rendered the aircraft an unreasonably dangerous product at the time of its purchase;

5. The defect rendering the aircraft unreasonably dangerous did not arise from normal use of the aircraft;
572 S.W.2d at 308.

that should be the test. *Signal Oil* meets that test and that should be enough.

This court amended Rule 277, Tex.R. Civ.P., to eliminate inferential rebuttal issues, and to simplify charges to juries. Commencing in 1971 in *Yarborough v. Berner,* 467 S.W.2d 188 (Tex.1971), this court has by a series of cases ending in *Parker v. Highland Park, Inc.,* 565 S.W.2d 512 (Tex. 1978), reduced negligence cases to a few simple issues of negligence, contributory negligence and damages. Simultaneously, we are well along the road toward adding satellite issues to a products liability case about as fast as we eliminated them in negligence actions. We are today adding a new, unnecessary and confusing concept to strict liability cases by the division of "his property" into the product itself and "other" property.

Rule 277, Tex.R.Civ.P., abolished inferential issues. Today we back into a new kind of inferential issue. A plaintiff, to prove an action in strict liability, must in the future prove not only that there was a defect that was unreasonably dangerous that caused damages, but also that the damages are *not* to the product itself. Our first two examples which attempt to apply the test are reasons we should condemn the test. A defective clip causes an airplane to crash. A defective bolt causes a chemical unit to burn. Both defects are unreasonably dangerous. Both cause damages to the rest of the thing that was purchased. The defective clip, holds our court, did not cause damages to the other parts of the airplane, but the defective bolt caused damages to the other parts of the isomax unit.

I concur in the result.

## ON MOTION FOR REHEARING

JOHNSON, Justice.

▇ On motion for rehearing Signal urges that the court clarify what issues or matters may be relitigated on remand of the implied warranty cause of action. Signal asserts that several issues constituted findings under the implied warranty cause of action, as well as under the causes of

action in negligence and strict liability which were affirmed; *i. e.,* the damages issue and issues on Signal's negligence. Signal points out that judicial estoppel might be asserted as a defense should it attempt to relitigate these issues. This court has held that the implied warranty cause of action between Signal, Procon, and Alcorn is remanded for a full trial on the merits. By so holding, this court intended that all evidence and issues as to liability, causation, defenses, and damages in the implied warranty cause of action were to be presented and relitigated in the trial court.

▇ Should the issue of Signal's contributory negligence be raised as a defensive matter, the defendant shall carry the burden of requesting submission of a special issue by which it might be determined the degree to which each party contributed to the damages.

With such clarification, all motions for rehearing are overruled.

Concurring opinion on motion for rehearing by POPE, J.

POPE, Justice, concurring.

There is a basic fallacy in the majority opinion. The first holding is that damages to the product itself creates only a contract action for economic loss on implied warranty. The majority next holds that this is an action for tort in the fashion of strict liability because the damages to the product spilled over onto "other" property. The majority then denies the plaintiff any recovery on that basis, so the plaintiff has lost its case on the theory that the majority says was a correct one.

What is left then for trial? If this is, as the majority says, a tort case, then why is it being remanded for trial as a contract case? If it is a strict liability case, why is it remanded for retrial as a case for breach of an implied warranty? What the majority is really saying is that it is unimportant whether the plaintiff's action is one in tort or contract. Whatever the case might be, the plaintiff can try it once, lose it, and then start over in a new trial. The ruling is

basically unfair and affords a plaintiff two separate trials on the same set of facts.